UNITED STATES of America, to the Use of ACME FURNACE FITTING CO., a body corporate

v.

FT. GEORGE G. MEADE DEFENSE HOUSING CORPORATION NO. 1, a body corporate, Anthony P. Miller, Inc., a body corporate, McCloskey & Company, a body corporate, Aetna Casualty & Surety Company, a body corporate, Fidelity & Deposit Company of Maryland, a body corporate, New Amsterdam Casualty Company, a body corporate, Fireman's Fund Indemnity Company, a body corporate, and Standard Accident Insurance Company, a body corporate.

Civ. A. No. 11123.

United States District Court
D. Maryland.

July 6, 1960.

William J. Little, Baltimore, Md., Macleay, Lynch & MacDonald, C. E. Channing, Jr., Francis W. McInerny, Washington, D. C., for plaintiff.

Norman P. Ramsey and A. T. Hartman, Baltimore, Md., for defendants.

R. DORSEY WATKINS, District Judge.

This suit, originally alleging jurisdiction under the Miller Act, Title 40 U.S.C.A. § 270a et seq., and subsequently amended to allege jurisdiction both under the Miller Act and under the Capehart Act, Title 42 U.S.C.A. § 1594 et seq., was brought by the United States to the use of Acme Furnace Fitting Company (Acme) against Fort George G. Meade Defense Housing Corporation No. 1 (Housing Corporation), Anthony P. Miller, Inc., (Miller), McCloskey & Company (McCloskey), and five insurance companies (sureties) to recover $90,140.79 together with interest and costs on a payment bond for materials furnished and delivered by Acme to Sunbeam Heating & Air Conditioning Company, Inc. (Sunbeam) and used by Sunbeam in the installation of a heating system in the prosecution of work under a contract for the construction of certain Capehart Housing units at Fort George G. Meade, Maryland. Defendants filed a motion to dismiss the amended complaint together with an affidavit and four exhibits in support thereof.

### Facts.

On June 27, 1957 a contract was executed between the United States of America acting through the Department of the Army (Department), Miller as "Eligible-*Builder*" (emphasis supplied) and the Housing Corporation as "Mortgagor-Builder". The contract (Housing Contract) is attached as Exhibit 1 to the amended complaint and shows on its face that it was entered into pursuant to "Title IV of the Housing Amendments of 1955 (Public Law 345, 84th Congress, 69 Stat. 635) as amended." The section of the Act herein involved is codified in section 1594, 42 U.S.C.A. The Housing Contract recites that the aforementioned Housing Amendments of 1955 authorize the Department to contract on the basis of competitive bids for the construction of housing and provide for the assistance of the Federal Housing Commissioner (Commissioner) in the financing of such construction through the insurance of mortgages. The contract further states that Miller submitted the lowest acceptable bid and was awarded the contract as "Eligible-Builder." Miller caused the Housing Corporation designated in the Housing Contract as the Mortgagor-Builder to be incorporated and caused the stockholders thereof irrevocably to deliver to Miller certificates representing all the capital stock of the Housing Corporation for eventual deposit in escrow with the mortgagee, and the officers and directors of the Housing Corporation delivered to Miller their resignations effective on the date the capital stock of the Housing Corporation is delivered to the Department, such resignations to be deposited in escrow with the mortgagee. The Housing Contract also contained the recital that the Department had, con-

temporaneously with the delivery of the Housing Contract, delivered to the Housing Corporation a lease of the land upon which the housing project was to be constructed and that the Housing Corporation had arranged for the financing of the construction of the housing project with a mortgagee (Kings County Trust Company), which arrangement contemplated the execution of a mortgage on the leasehold interest to be insured by the Commissioner. At the time of the execution of the contract, Miller had reimbursed the Department for the design, inspection and administrative costs of the project already, or to be, incurred. The Housing Contract then provided that Miller should furnish all labor, material, tools, plant and equipment and perform all services and work necessary to construct certain houses according to specifications entitled "Specifications for Armed Services Housing Project (Capehart), 1000 Housing Units at Fort George G. Meade, Maryland." Other general terms applicable to the performance of the Housing Contract were likewise included.

Article III of the Housing Contract stated:

"The mortgagor-builder [Housing Corporation] shall pay the eligible builder [Miller] for the performance of this Housing Contract, and all other obligations of the eligible builder [Miller] herein, the sum of $16,500,000.00."

Article X of the Housing Contract provided, in pertinent part:

"The eligible builder agrees not to *assign* this Housing Contract or any amount payable hereunder *or* to *sublet the whole* or substanially the whole of this Housing Contract *to any principal subcontractor, other than the principal subcontractor described by the eligible bidder in his bid by the submission therewith of a completed form entitled 'Personal and Financial Credit Statement' cov-ering such principal subcontractor, * * *.*" (Emphasis supplied.)

Simultaneously with the execution of the Housing Contract and the delivery to the Housing Corporation of the lease of the land upon which the housing project was to be constructed, a bond was executed "on June 27, 1957, between Anthony P. Miller, Inc., as principal, and Aetna Casualty and Surety Company, a Connecticut corporation, The Fidelity & Deposit Company of Maryland, a Maryland corporation, the New Amsterdam Casualty Company, a New York corporation, the Firemen's [sic] Fund Indemnity Company, a California corporation, and the Standard Accident Insurance Company, a Michigan corporation, as sureties, and Fort George G. Meade Defense Housing Corporation No. 1 and Kings County Trust Company, as obligees, and which bond was given in connection with the contract (referred to in paragraph 3 of the amended complaint) between the United States of America, acting by and through the Department of the Army, Anthony P. Miller, Inc. and Fort George G. Meade Defense Housing Corporation No. 1."[1]

Two days later, on June 29, 1957 Miller and McCloskey entered into a contract whereby all of the work under the Housing Contract was "subcontracted" by Miller to McCloskey. This agreement is attached as Exhibit B to the Affidavit filed with the defendants' motion to dismiss. It refers to the Housing Contract and recites that Miller in submitting its bid for the performance of the Housing Contract described McCloskey as the "principal subcontractor" and "stated in connection with its bid that the Eligible-Builder [*Miller*] *contemplated subcontracting the whole* of the Housing Contract to McCloskey & Company". (Emphasis supplied.) The agreement between Miller and McCloskey then provided that McCloskey was to furnish all labor, materials, tools, plant and equipment, and perform all services and work necessary to construct the 1,000 Housing

---

1. Paragraph one of affidavit in support of defendants' motion to dismiss amended complaint.

Units according to the specifications set forth in the Housing Contract between the Department, Miller and the Housing Corporation, which Housing Contract was incorporated by reference and made a part of the Miller-McCloskey agreement. Miller agreed to pay McCloskey for McCloskey's performance of the contract work and of all other obligations of Miller under the Housing Contract the sum of $16,500,000; the identical contract price for which Miller had undertaken to perform in the original Housing Contract.

A contract between McCloskey and Sunbeam Heating and Air Conditioning Company (Sunbeam) was entered into on July 15, 1957, whereby Sunbeam agreed to install the heating systems required in the houses in question. This contract is attached as Exhibit 2 to the amended complaint and is designated on its face as a subcontract between Sunbeam as "subcontractor" and McCloskey as "principal subcontractor." Under its terms Sunbeam agreed to install heating systems pursuant to the specifications which accompany the Housing Contract.

The amended complaint alleges, and it is not presently disputed, that the use-plaintiff, Acme, at the request of Sunbeam furnished substantially all of the materials which were used by Sunbeam in the installation of the heating system, and that Acme was not paid for the materials supplied, the value of which is stated to be $90,140.79.

### Issues.

Use-plaintiff contends that the payment bond given in connection with the Housing Contract was a Miller Act bond furnished pursuant to the provisions of Title 40 U.S.C.A. § 270a and that hence the sureties and Miller became, and are, jointly and severally bound to pay Acme's claim in accordance with the provisions of section 270b of Title 40 U.S.C.A.

The defendants take the position (1) that this court is without jurisdiction in the case for the reason that the complaint together with the exhibits thereto and the affidavit filed with the defendants' motion to dismiss show on their face that the payment bond was not a Miller Act bond; (2) that section 1594 et seq. of Title 42 U.S.C.A., the law pursuant to which the Housing Contract in question was entered into, does not of itself confer a right upon a materialman to bring suit in the federal courts upon a payment bond given pursuant thereto; (3) that Acme is excluded from the protection of the surety bond given in connection with the Housing Contract in question for the reason that the protection of said surety bond is by the terms thereof limited to one who has a contract with the alleged principal, Miller, or with a subcontractor of said alleged principal, and that Acme had no such contract with Miller or a subcontractor of Miller; and (4) that, assuming arguendo that the Miller Act applies, Acme does not come within the purview of the act having had no contract with Miller, alleged by defendants to be the prime contractor, or with McCloskey, alleged by defendants to be Miller's subcontractor.

### Discussion.

1. An examination of the various exhibits filed with the amended complaint and with the affidavit in support of defendants' motion to dismiss the amended complaint shows that the payment bond in question is not a technical Miller Act bond as it does not come within either the letter or the intent of the Miller Act.

Section 270a provides:

"(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as 'contractor':"

\* \* \* \* \* \*

"(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and materi-

al in the prosecution of the work provided for in said contract for the use of such person. * * * Whenever the total amount payable by the terms of the contract shall be more than $5,000,000 the said payment bond shall be in the sum of $2,500,000."

 The statute thus stipulates that the payment bond shall be furnished "to the United States". The payment bond given here runs in favor of the Housing Corporation, Fort George G. Meade Defense Housing Corporation No. 1, not in favor of the United States. The requirement that Miller Act bonds must be furnished "to the United States" has been held in three unreported decisions [2] to mean that in the case of such bonds the United States shall be named as sole obligee, a condition not herein met. Moreover, although the present issue was not directly raised, of significance is the quotation with approval by the Court of Appeals for the Fourth Circuit in a Miller Act case of the following language in United States for Use of Spencer v. Massachusetts Bonding & Insurance Co., 6 Cir., 1927, 18 F.2d 203, 204—a case involving the bond provisions of the Heard Act, which act was the predecessor of the Miller Act.

"'* * * The bond is in the usual form. It runs to the United States. Its penal clause binds the principal and sureties only to the United States. The conditions are only for the faithful performance of all undertakings, covenants, terms, and conditions of the contract of Norman Ker Company with the United States, copy of which is attached, and for the prompt payment to all persons supplying labor or materials in the prosecution of the work provided for in that contract. The first part of these conditions runs exclusively to the United States, and is apparently designed to benefit and protect the United States and no other person. The second part of the condition is for the benefit of third persons of a certain class. Read in connection with the statute, it is apparent that this part of the condition is for the benefit and protection of all persons supplying labor or materials in the prosecution of the work, and that a right of action is thereby conferred upon

2. "The courts have been unanimous in holding that the Miller Act contemplates the filing of bonds with the United States Government as the named obligee. (See U. S. for the benefit of Sherman v. Carter, 353 U.S. 210 [77 S.Ct. 793, 1 L. Ed.2d 776] (1957); U. S. for the use of Hopper Bros. v. Peerless Cas. Co., 255 F.2d 137 (8 Cir. 1958); cf. MacEvoy Co. v. U. S. for the use of Calvin Tomkins Co., 322 U.S. 102 (1944) esp. n. 4 at 105–106 [64 S.Ct. 890, 88 L.Ed. 1163]).

"The Miller Act affords protection to creditors of the contractor not by requiring a bond running to subcontractors or other private parties, but by permitting them to sue on the payment bond which the contractor is required to file with the United States." (Lawrence A. Octeau, d/b/a Octeau Oil Co. v. American Surety Co. of New York, D.C. R.I., C.A. 2419, opinion by Judge Day).

"Examination of the case law seems to indicate clearly that the standard form of bond contemplated by the Miller Act is a bond naming the United States

as the sole obligee. Numerous cases could be cited for that proposition. Among them are U. S. for Use of Morris Paint Co. v. Watson, 1955, D.C.Neb., 129 F.Supp. 573; U. S. for Use of Lichter v. Henke Const. Co., 1940, D.C.Mo., 35 F.Supp. 388; and numerous other cases.

"It is certainly clear here that the bond upon which each of these counts is predicated is not in the form required to be executed under the Miller Act and, therefore, cannot stand as an independent basis for the jurisdiction of this Court." Westinghouse Electric Supply Co. et al. v. Maguire Homes, Inc. (Val LeClerc, d/b/a, et al. v. Maguire Homes, Inc.), D.C.R.I.1959, C.A. No. 2449 and C.A. No. 2458, opinion by Judge Day).

See also United States for Use of General Accident Fire & Life Assurance Corp., Ltd. v. Maguire Homes, Inc., D.C. Mass.1959, —— F.Supp. —— a memorandum opinion of Judge Wyzanski holding that the Miller Act contemplates bonds in which the United States is the obligee.

them. * * *'" United States for Use of Gibson v. Harman, 4 Cir., 1951, 192 F.2d 999, 1000–1001, emphasis supplied.

Furthermore it should be noted that the official form for a Miller Act payment bond as set forth in Title 41 U.S.C.A. section 54.16 of the appendix provides that the United States shall be the obligee.

The bond furnished does not coincide with the Miller Act in another respect. The price named in the Housing Contract is $16,500,000 and the penalty of the bond is in like amount. Section 270a of the Miller Act provides that whenever the amount payable by the terms of the contract is more than $5,000,000 the payment bond shall be in the sum of $2,500,000.

Finally section 1594(a) of Title 42 U.S.C.A., pursuant to which the Housing Contract and payment bond herein were executed, provides in pertinent part:

> " * * * Any such contract shall provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, and the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of section 270a of Title 40, and no additional bonds shall be required under such section."

This language, although indicating that Capehart Housing Projects would otherwise come within the provisions of the Miller Act, by providing that a payment bond furnished pursuant to section 1594(a) constitutes "a sufficient compliance" with the provisions of the Miller Act and that "no additional bonds shall be required" under section 270a of Title 40 U.S.C.A. makes clear that the bond herein involved is not, as alleged by use-plaintiff, a Miller Act bond furnished pursuant to the provisions of Title 40 U.S.C.A. § 270a.

Nor does the payment bond in question come within the purpose and intent of the Miller Act. It is well settled, of course, that laborers and materialmen may not assert a lien against the United States and it was because of this that the Miller Act was enacted. This was recognized by the Supreme Court of the United States in United States v. Munsey Trust Co., 1947, 332 U.S. 234, 241, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022, where it was said:

> " * * * nothing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation. (citing cases) * * and as a substitute for that more customary protection, the various statutes were passed which require that a surety guarantee their payment. Of these, the last and the one now in force is the Miller Act under which the bonds here were drawn."

Likewise, the United States Court of Appeals for the Fourth Circuit in United States for Use of Gibson v. Harman, 1951, 192 F.2d 999, 1000, said through Chief Judge Parker that the Miller Act "was intended to provide for those who furnish labor and materials for government construction *protection analogous to that afforded by mechanics' and material furnishers' liens in the case of private construction*" (Emphasis supplied.) It has been held by the Circuit Court for Anne Arundel County that a materialman who furnished concrete on the very housing project involved in this action was entitled under Maryland law to a lien against the leasehold interest of the Housing Corporation, Fort George G. Meade Defense Housing Corporation No. 1 (Frederick Massiah v. Admix Concrete Corporation, in the Circuit Court for Anne Arundel County, in Equity No. 13,062, Magill, J.) The basic holding of that case is that the leasehold interest of Fort George G. Meade Defense Housing Corporation No. 1 is a private one which is subject to the mechanics' lien law.

Acme, aware of its possible rights under the mechanics' lien law of Maryland, on October 20, 1958, prior to the filing of the complaint in this case, filed a mechanic's lien in the Circuit Court for Anne Arundel County against the Housing Corporation. This lien is for the same material which is the subject of this suit. The defendants have advised the court that, since the filing of their motion herein to dismiss, Acme has filed a Bill of Complaint in the Circuit Court for Anne Arundel County to foreclose this mechanic's lien. To the extent that Acme may avail itself of the mechanics' lien law of Maryland, the applicability of the Miller Act would thereby logically be denied—but only insofar as its requirement of the furnishing of a payment bond is involved.

 While Judge Magill's opinion is not binding upon this court and decisions of nisi prius courts have been known to be reversed, his holding is persuasive, and entitled to respect. The cases cited by him fully support his conclusion that the so-called Capehart Act contemplates leaving the entire arrangement for the financing and construction of Capehart housing projects in the hands of private enterprise until the point at which the government has secured the capital stock of the Housing Corporation and that, as the land in question was leased to a private corporation, its leasehold interest is subject to the mechanics' lien law of Maryland. This conclusion, if correct, would preclude the leasehold interest in question from coming within the intent of a payment bond furnished under the Miller Act but not of one furnished under the Capehart Act. Nor does the Massiah decision, holding that the interest of the Fort George G. Meade Defense Housing Corporation No. 1, as a lessee, is lienable constitute authority for the corollary that defendants advocate; namely, that such lienable interest renders the housing project in question something other than a public work. It may be observed in this connection that, while this court has held that the bond furnished was not a technical Miller Act bond, among the very "facts" of the Massiah case *assumed to be true for the purpose of the Court's decision on demurrer* were the following:

"Whereupon, on June 27, 1957, the contractor entered into a contract with the Government and Meade Co. for the construction of the housing units under the control, inspection and supervision of the Corps of Engineers, U. S. Army, and *pursuant to section 1594(a) of Title 42 U.S.C.A. the contractor furnished a Miller Act bond* in the penal amount of $16,500,000.00 with Aetna Casualty, Fidelity and Deposit, New Amsterdam, Fireman's Fund and Standard Accident, hereinafter called 'the surety', as co-sureties." (Court's opinion, page 2—emphasis supplied.)

Moreover, the Court carefully observed the paramount right of the Government:

"This Court *finds nothing in the facts so far presented that would indicate that the public interest or purpose of the Federal Government* would be subverted by the allowance of the lien. * * * The Government, by such sale could not be deprived of its paramount right to the use and control of the property." (Court's opinion, page 6—emphasis supplied.)

Thus, the Massiah opinion is authority for the proposition that the lienable interest of the Fort George G. Meade Defense Housing Corporation No. 1, as lessee, is of importance only as a means of leverage to force payment to a supplier and materialmen by way of otherwise closing off the progress payments to be received by his debtor. The case serves as an example of a form of lienable interest for the protection of laborers, suppliers and materialmen which coexists with a public work. It may be concluded that under the present circumstances arising from the Capehart legislation providing for *private financing and construction of public works* that Congress intended that two avenues

might exist for the relief and protection of the materialman: *First,* a lien against the lienable interest of the lessee, if such a lien may be asserted, as an indirect pressure against the debtor and, *Second,* recovery under a Capehart payment bond.

2. The District Court for the District of Rhode Island has held that the court is without jurisdiction where the plaintiff has relied solely upon section 1594 et seq. of Title 42 U.S.C.A., as the Capehart Act does not of itself confer a right upon a materialman to bring suit in a federal court on a payment bond such as was furnished in the instant case.[3]

█ In the instant case, however, use-plaintiff has alleged jurisdiction under the Miller Act as incorporated by reference in the Capehart Act. While the court has ruled that the bond furnished was not a Miller Act bond, this ruling does not of itself answer the contention that the two acts in question are in pari materia and when construed together create a cause of action in favor of a materialman and confer jurisdiction upon this court authorizing a suit such as the present one. Support for use-plaintiff's position can be found in memorandum ruling by Judge Hunter, of the District Court for the Western District of Louisiana, in which he stated:

" * * * We agree with counsel for plaintiffs that the Miller Act and the Housing Act are harmonious, and that the congressional intent was and is that only one bond be required where construction of a public building is contracted. Section 1594 of Title 42 merely makes mandatory that the bond be satisfactory to the Secretary of Defense in those instances where the con-

tract involves the construction of housing for military personnel.

"Counsel have cited no cases on point, and the Court has found none, but is holding that Title 40, Section 270(b) should be given effect here, and the Court will retain jurisdiction of this suit. The motions to dismiss should be denied." [4]

Furthermore, the 1956 amendment to Title 42 U.S.C.A. § 1594, subsection (a), by Act of August 7, 1956, section 507, providing that any Capehart construction act contract shall provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, that the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of section 270a of Title 40, and that no additional bonds shall be required under such section, if not expressly stating, strongly implies that Capehart Housing contracts do come under the payment bond provisions of the Miller Act but that a Miller Act bond is not required if a bond is given under subsection (a) of section 1594 of Title 42 as such a bond suffices for the bond required by the Miller Act; otherwise, section 1594(a) would have said that Capehart Housing contracts are not within the purview of 270a of Title 40, and, therefore, no bond is required by that Title and section. By the use of the words of section 1594(a), "shall be deemed a sufficient compliance with the provisions of section 270a of Title 40 * * * *", it is contended by the defendants that this cause of action is completely removed from any of the benefits and protection of the Miller Act. However, the ordinary meaning of the word *"compliance",* far from intending a re-

3. Wheeler d/b/a Sun Valley Construction Co. v. Maguire Homes, Inc. et al., D.R.I. 1958, C.A. 2369, unreported opinion by Judge Day; Octeau d/b/a Octeau Oil Co. v. American Surety Co. of New York, D.R.I.1959, C.A.2419, unreported opinion by Judge Day; Westinghouse Electric Supply Co. et al. v. Maguire Homes, Inc., D.R.I.1959, C.A. 2449, unreported

opinion by Judge Day; LeClerc v. Maguire Homes, Inc., D.R.I.1959, C.A. 2458, unreported opinion by Judge Day.

4. Autrey v. Williams & Dunlap (Luther v. Williams & Dunlap, United States ex rel. Conner v. Williams & Dunlap Construction Co., Inc.), D.C.1959, 185 F.Supp. 802.

peal or exclusion, imports the opposite. Indeed, Webster's New International Dictionary, unabridged, uses the words: "submission", "obedience" and "conformance" in defining "compliance". As a Capehart Act bond constitutes "compliance" with section 270a of Title 40 and section 270b of said title authorizes suit by a materialman on a payment bond furnished under section 270a, this court can conclude only that section 270b, read in conjunction with section 1594(a) of Title 42, confers jurisdiction upon the court.

■ There remains, however, the additional problem of whether or not the bond herein involved is, in fact, a Capehart Act bond. The previously mentioned four decisions of Judge Day (see this opinion, footnote 3, 186 F.Supp. 647) and the unreported memorandum opinion of Judge Wyzanski (see this opinion, footnote 2) hold that the clear implication of Title 42 section 1594(a) is that the bonds required under that section are bonds naming the United States the obligee. This court cannot agree with such a construction. Rather the court concurs with Judge Hunter's ruling that the Capehart Act merely makes mandatory that the bond required be satisfactory to the Secretary of Defense. That the bond in question met this requirement is evidenced by the following facts. The Contract was entered into by the federal government and was entitled "Department of the Army Housing Contract", bearing the identifying caption of: "FHA Project No. 052–81002–Army No. 2". The United States, acting by and through the Department of the Army, was expressly made one of the three parties to the said Housing Contract.

■ It is not disputed that the present Housing Contract was entered into pursuant to, and is based upon, the Capehart Act, section 1594 et seq. Title 42 U.S.C.A. This fact is recited in the contract itself and is admitted in paragraph 4 of defendants' motion to dismiss and paragraph 2 ·of the affidavit attached thereto. In compliance with the Capehart Act the said Housing Contract explicitly provided for the payment bond in question. Paragraph 21 of the government contract expressly stated:

> "(21) *The eligible builder*, simultaneously with the delivery of this Housing Contract, *shall furnish the Mortgagor-Builder and the Mortgagee with assurance of completion in the form of a (sic) performance and payment bonds*, each in the penal sum of 20% of the contract price, *using FHA Forms Nos. 2452C and 2452CP*, endorsed by a corporate surety acceptable to the Department, the Mortgagee and the Commissioner." (Emphasis supplied.)

Pursuant to these requirements, the payment bond in question was written. It is entitled: "Federal Housing Administration Payment Bond—Dual Obligee." This bond is written on the regular federal government bond form designed as "FHA Form No. 2452CP". The heading of this bond bears the identifying caption relating to the Housing Contract: "FHA Project No. 052–81002–Army No. 2." This regular government bond form of the Federal Housing Administration in the statement of its conditions, significantly, sets forth in substance the provisions of the Miller Act enacted for the protection of suppliers of labor and materials on public works.[5] The bond, as required, was furnished to the mortgagor-builder (Fort George G. Meade Defense Housing Corporation No. 1) and the mortgagee (Kings County Trust Co.) described as "owner-obligee" and "lender", respectively, as obligees.[6]

---

5. See pages 2 and 3 of the F.H.A. form bond furnished vis-à-vis Title 40 U.S. C.A. § 270b for comparison.

6. It should be noted that Title 12 U.S. C.A. § 1748f, authorizes the Federal Housing Commissioner to issue rules and regulations. Pursuant to such law, the

Federal Housing Commissioner issued the following regulation:

"Assurance for the completion of a project shall be a performance bond and a payment bond *satisfactory to* the Commissioner and *the Secretary of Defense or his designee* with *the mort-*

To this court the conclusion is inescapable that the bond issued was a Capehart Act bond and thus, to reiterate, for the reasons previously stated when the two Acts involved are construed together this court has jurisdiction under the provisions of section 270b of Title 40 U.S.C.A.

However, even if this conclusion be incorrect, since it presently appears from the pleadings that diversity of citizenship and the requisite amount in controversy exist, the court will—if this be the case and the use-plaintiff so desires—entertain pursuant to section 1653 of Title 28 U.S.C.A. a motion by said plaintiff to amend its pleadings to allege formally jurisdiction, in addition, under Title 28 U.S.C.A. § 1332 in order to permit a ruling on the merits.

 3. and 4. Whether or not Acme is excluded from the procedural protection of the Miller Act or from the protection afforded by the surety bond given in connection with the housing contract in question for the reason that the protection of the Miller Act and the protection of said bond are by their terms limited to one who has a contract with the principal or with a subcontractor of the principal, defendants alleging that Acme had no such contract, raises disputed issues of fact and thus precludes a ruling at this time on defendants' motion to dismiss.

To bring itself within the jurisdictional provisions of the Miller Act read in conjunction with payment bond requirements of the Capehart Act use-plaintiff contends that McCloskey, not Miller, was the prime contractor. In support of this contention, in count one of the amended complaint Acme asserts that a complete assignment of the Housing Contract was intended at the outset by all parties to the contract, including the federal government, alleging:

" * * * the 'Principal Subcontractor' [McCloskey] was specifically accepted by the Department of the Army in its letter of acceptability in accordance with the invitation for bids and the award of the contract to Anthony P. Miller, Inc. (The Housing Contract, page 1) and by the Federal Housing Commissioner in connection with the financing of such construction and the insurance of mortgages by virtue of his issuance of a 'Commitment for Insurance' (The Housing Contract, page 2). Further, it is alleged that it never was the intention of the parties to The Housing Contract that Anthony P. Miller, Inc. would perform the actual construction work, but on the contrary it was the specific intention that the Defendant McCloskey & Company would construct and complete the entire project. The so-called 'Eligible Builder' was to build nothing; but rather the 'Principal Subcontractor' which was qualified by experience and financial responsibility to construct housing of the type described was to be the actual builder or, as commonly referred to in the building industry, the 'prime contractor.' "

Use-plaintiff has support for its allegations and contentions in that the original housing contract—between the United States of America acting through the Department of the Army, Miller and Fort George G. Meade Defense Housing Corporation No. 1—designates the parties involved as follows:

Miller—"Eligible *builder*" (page 1, exhibit 1 attached to amended complaint—emphasis supplied).

Housing Corporation—"Mortgagor *builder*" (same page—emphasis supplied).

McCloskey & Company—"Principal subcontractor" (page 9 of same exhibit 1—emphasis supplied).

The same designations are used in the agreement between McCloskey and Miller (Exhibit B attached to affidavit in support of defendants' motion to dismiss.) The agreement between McCloskey and

*gagor and mortgagee as joint obligees."* (See 21 F.R. 6019, dated August 11,

1956 and codified in 24 CFR section 292a.27). (Emphasis supplied.)

Sunbeam Heating (which is not a defendant in the instant case but is the company with which use-plaintiff Acme had a contract for the furnishing of the items in suit) describes McCloskey as "principal subcontractor" and Sunbeam as "subcontractor." These designations are of significance as Chief Judge Thomsen in United States for Use and Benefit of Newport News Shipbuilding & Dry Dock Co. v. Blount Brothers Const. Co., D.C.Md.1958, 168 F.Supp. 407, at page 411 in holding a sub-sub-subcontractor having an agreement with a sub-subcontractor stood in too remote a relationship to come within the coverage of the Miller Act noted that the *use-plaintiff* sought to avoid Chief Judge Thomsen's holding by referring to the subcontractor as the first subcontractor and the sub-subcontractor as the second subcontractor (and on down the line). Judge Thomsen stated the term "second subcontractor" *was not customarily used in the trade or by the courts and was inaccurate.* In this case, however, the designations relied upon by use-plaintiff Acme in seeking recovery were chosen and used by the United States acting through the Department of the Army, were authorized by Title 42, § 1594; were incorporated by Miller and McCloskey in their agreement and by McCloskey and Sunbeam in their contract. Although section 1594 does not use the word "principal subcontractor" it should be noted that it does refer to one in Miller's position as "eligible *bidder*" not "eligible *builder*." Prior to August 7, 1956 the statute in question used the word "eligible *builder*." Also there was at that time no provision relating to the furnishing of a performance and payment bond with surety satisfactory to the Secretary of Defense (see historical note to section 1594 re: 1956 amendment by Act of August 7, 1956). The legislative history and purpose of the amendment offer no explanation for these changes. The Housing Contract in question was executed subsequent to the 1956 amendment, i. e. June 27, 1957 but said contract still uses the old terminology—eligible *builder*. The statutory change

of the wording eligible *builder* to eligible *bidder* might well indicate that in the instant case Miller was not, in fact, the prime contractor although § 1594(a) of Title 42 requires the "contractor" to furnish such bond; Article XIII of the housing agreement required Miller to furnish such bond and the payment bond attached as exhibit to motion to dismiss recites that Miller is the principal on said bond. In addition, the argument that Chief Judge Thomsen rejected (and with which decision this court agrees) as to first and second subcontractors may have some validity in the present case in view of the following provision of the Housing Contract appearing as paragraph 38 at page 31.

"38. Utilization of Small Business Concerns.

"It is the policy of the Department as declared by the Congress to bring about the greatest utilization of small business concerns which is consistent with efficient production. *The eligible builder agrees to accomplish the maximum amount of subcontracting* to small business concerns that the eligible builder finds to be consistent with the efficient performance of this Housing Contract." (Emphasis supplied.)

Construing this provision with Article X of Housing Agreement (page 9) restricting the eligible "builder" from assigning or subletting the whole or substantially the whole of the contract to any "principal subcontractor, other than the principal subcontractor described by the eligible bidder * * * except with prior written consent of the Contracting Officer, the mortgagee and the commissioner" and with the recital in the Housing Contract in regard to McCloskey's financial responsibility and experience, it would appear that the Department was looking to McCloskey as the one who was to do the work and intended and agreed that there would be a complete substitution of McCloskey for Miller.

Thus Acme argues the original arrangements evidence, on their face, that

the role of Miller at the outset was either that of a broker as a five percenter, or, that of an agent for its disclosed principal, McCloskey, or that of co-adventurer with McCloskey; that Miller's sole contribution to such joint adventure might well be the acquisition of the Housing Contract; that it cannot be said that Miller at any time even contemplated or intended to perform any act in the role or function of prime contractor; equally, that it cannot be said that McCloskey at any time contemplated or intended to perform any role or function other than that of prime contractor; and, indeed, that the role and function of prime contractor was precisely the action, the performance, and the accomplishment of McCloskey.

In count two Acme alleges that, regardless of the arrangement contemplated by the parties (including the federal government) to the original Housing Contract, in fact, the actual arrangement between Miller and McCloskey was that of a joint venture, this not being the first time that they had entered into such an arrangement. Count two asserts, in pertinent part, that Miller and McCloskey were joint venturers "in connection with the performance of the Housing Contract" and that as such "each was the duly authorized agent of the other." This "agency" is specifically alleged with reference to the execution and performance of Sunbeam's contract with McCloskey.

If, on the merits, Acme can sustain its allegation of complete assignment or of joint venture so as to prove that Sunbeam's contract with McCloskey was, in fact, one made by McCloskey as a prime contractor or as a part of a joint venture with Miller and as an agent of Miller, thereby making Miller a party to Sunbeam's contract, the paper relationship of the parties would be telescoped. Sunbeam would accordingly become a subcontractor and Acme as a materialman supplying Sunbeam would be within the purview of the Miller Act, not standing in too remote a relationship under Chief Judge Thomsen's holding in

United States for Use and Benefit of Newport News Shipbuilding & Dry Dock Co. v. Blount Brothers Const. Co., D.C. Md.1958, 168 F.Supp. 407.

Defendants contend that the allegations of total assignment or joint venture are wholly inconsistent with the contractual arrangements between Miller and McCloskey on the one hand and McCloskey and Sunbeam on the other, *as these arrangements are shown in the contracts which have been filed as exhibits herein and in the affidavit filed with the defendants' motion to dismiss.*

Although defendants upon oral argument took the position that the true relationship between Miller and McCloskey is revealed upon the face of the prime and subcontracts, technically their motion to dismiss for the purposes of said motion admitted use-plaintiff's allegations of complete assignment and/or of joint venture and thus defendants cannot at the same time then deny that Sunbeam's contract was with the prime contractor (McCloskey) and/or an agent (McCloskey) of the principal (Miller) on the bond. Accordingly, under either count one or count two Sunbeam Co. would be a subcontractor and not a sub-subcontractor. Use-plaintiff contracting as a materialman with Sunbeam Co. would clearly be within the purview and scope of the protection of the Miller Act and, at least as to count two, any reading of the particular bond involved here.

Moreover, as a practical matter, the entire arrangement literally taken on its face alone does not reflect a sensible (or reasonably conceivable) business arrangement. Miller gets a contract for $16,500,000. The entire performance, as originally intended, is taken over by McCloskey at the identical contract price of $16,500,000 yet Miller is responsible for performance; Miller furnishes the bond, the premium on which is $85,000; and Miller undertakes to supervise, make requisitions and to distribute contract payments to McCloskey for performance in exactly the same proportions in which Miller is to receive them—to make this outlay, do all of this bookkeeping and

have all of this responsibility, for what? The court is not only interested in, but obviously cannot decide the case without, factual information as to the actual relationship between Miller and McCloskey, for on the issue of whether or not the use-plaintiff stands in too remote a relationship to the prime contractor, the problem before the court is, does substance or form control in determining who is the prime contractor; that is, whether entitlement to relief is governed by the actual role and function of performance of a party, or is otherwise based on some formal criteria, as the term or the label by which a party may be designated in a contract.

Substance controls. In MacEvoy Co. v. United States, 1944, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163, the Supreme Court looked to the function performed by the plaintiff in relation to the prime contractor. The Supreme Court found the plaintiff to be in substance a supplier of a materialman. This determination as to the substance, the actual role and function of performance of the plaintiff, was all-important. Substance, not form, was the crux and heart of the decision in the MacEvoy case. In the Blount case, D.C.Md.1958, 168 F.Supp. 407, supra, as in the MacEvoy case, Chief Judge Thomsen denied a claim of relief under the Miller Act. Again, however, the importance of the case is the ground of decision. The court stated (at page 411):

> "It is the character of the person *to* whom a use-plaintiff supplies labor and materials that is vital."

Consequently protection of the Miller Act was denied by the court to one furnishing labor and materials to a *sub-*subcontractor. Admittedly, the court did not in the Blount case pronounce any definition or standard of measurement to apply in adjudging the "character" of the person supplied by the use-plaintiff (other than to cite MacEvoy as authority). Nevertheless, in declaring the "character" of the person to be the vital element of decision, emphasis was placed squarely on substance, not form. Thus,

the basis of the Miller Act protection or protection under the bond in question is not primarily to be grounded on what the parties may be called or named, whether by themselves or others. On the other hand, it is a qualitative determination of the substantive, and functional role of performance of the parties under the circumstances, the "character", that is vital to the issue.

### Summary.

Clearly the payment bond given in this case was not technically of the type specified by Title 40, § 270a of the Miller Act. However, the 1956 amendment to the Capehart Act requiring the furnishing of a payment bond, and providing that if furnished it shall be deemed "a sufficient compliance with the provisions of section 270a of Title 40" of the Miller Act, indicates that prior to such amendment Congress must have considered that such housing contracts required the furnishing of a Miller Act bond but that subsequent to said amendment the furnishing of a payment bond upon terms and with sureties satisfactory to the Secretary of Defense, which is what exists in this case, is sufficient.

The provisions of § 1594(a) of Title 42 requiring the furnishing of a Capehart payment bond and providing it shall be deemed a sufficient compliance with the provisions of § 270a of the Miller Act incorporate by reference the provisions of § 270b of the Miller Act allowing one furnishing material, *and not standing in too remote a relationship, to sue on a payment bond* furnished under section 270a, *or furnished in compliance therewith,* for the amount allegedly due, thus authorizing the use-plaintiff to bring the present suit.

Because, under the pleadings and in order to rule on defendants' motion, discovery procedures are necessary to disclose the true relationship between the parties—specifically whether or not because of the original dealings between the Department, Miller and McCloskey and/or Miller and McCloskey, the use-plaintiff does or does not stand in too re-

mote a relationship to recover on the payment bond in question, the court will deny defendants' motion to dismiss, without prejudice; and with leave to the use-plaintiff to amend its complaint to allege jurisdiction on grounds of diversity of citizenship, if it so desires.

Judgment accordingly.